IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| EMTA INSAAT TAAHHUT VE<br>TICARET A.S.,<br>*Plaintiff*<br><br>    v.<br><br>COSMOPOLITAN INCORPORATED,<br>*Defendant.* | Civil Action No. ELH-20-1457 |

**MEMORANDUM**

Plaintiff EMTA Insaat Taahhut ve Ticaret A.S. ("EMTA"), a Turkish construction company, filed suit against defendant Cosmopolitan Incorporated ("Cosmopolitan" or "COSMO"), a general contractor, alleging breach of contract.  ECF 1 (the "Complaint"). Cosmopolitan retained EMTA to act as a subcontractor with respect to a federal construction project administered by the U.S. Department of State Overseas Building Operations (the "OBO"). COSMO allegedly failed to pay EMTA for its services and refused to reimburse EMTA for advances that it made on Cosmopolitan's behalf.  *Id.*

The Complaint contains three counts: breach of contract (Count I); specific performance (Count II); and violation of the Prompt Pay Act (the "PPA"), 31 U.S.C. § 3901 *et seq.* (Count III). ECF 1 at 7-9.[1]  The suit is supported by two exhibits.  ECF 1-2; ECF 1-3.

Cosmopolitan has answered the Complaint as to Counts I and II and asserted a counterclaim for breach of contract.  ECF 15.  Cosmopolitan has also moved to dismiss Count III under Fed. R. Civ. P. 12(b)(6).  ECF 15 (the "Motion").  EMTA has answered defendant's

---

[1] Subject matter jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  ECF 1, ¶ 3.

counterclaim (ECF 19) and opposes the Motion (ECF 18), supported by a memorandum. ECF 18-1 (collectively, the "Opposition"). Defendant has replied. ECF 24.

No hearing is necessary to resolve the motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I. Factual Background[2]

EMTA is a Turkish company with its principal place of business in Ankara, Turkey. ECF 1, ¶ 1. It is "engaged in the business of construction subcontracting and logistics in Turkey and the Middle East." *Id.*

Cosmopolitan is a Maryland corporation with its principal place of business in Colombia, Maryland. *Id.* ¶ 2. In 2017, Cosmopolitan entered into a contract with the OBO under Contract No. SAQMMA17F0152 (the "Prime Contract") for a project called the "Adana HATS Project" (the "Project"). *Id.* ¶ 5. "HATS" is an acronym for "hardened trailer systems" which are "a type of office trailer system." *Id.* The Project involved the installation of HATS at the U.S. Consulate in Adana, Turkey. *Id.* And, the Prime Contract was a "design-build contract under which Cosmopolitan was responsible to develop the detailed design for the work and the construct the work." *Id.* ¶ 7.

On July 17, 2017, Cosmopolitan and EMTA executed a "Subcontract Agreement." ECF 1-2 (the "Subcontract"). The parties amended the Subcontract twice—on or about January 20, 2018 and April 25, 2018—"to expand EMTA's scope of work." ECF 1, ¶ 8.

---

[2] Given the posture of the case, I must assume the truth of all factual allegations in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). However, the Court may "take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

Pursuant to the Subcontract, EMTA was responsible for the installation of certain HATS trailers after their delivery to Turkey.  ECF 1-2 at 2.  This responsibility included setting the trailers and installing utilities in accordance with the Subcontract and the designs developed by Cosmopolitan.  *Id.*

The Subcontract incorporates the Prime Contract.  The Subcontract states, ECF 1-2 at 2: "[T]he US Department of State Overseas Building Operations… and COSMO has entered into … [the Prime Contract] and Statement of work and attachments…are hereby incorporated by reference and are among the Final Contract Documents."  Further, the Subcontract provides that "EMTA shall perform all work per the [OBO's] or COSMO's requirements described in the Final Contract Documents."  *Id.*  And, "[e]xcept as may be specifically provided otherwise by the terms of this Subcontract Agreement, EMTA shall have only the rights which COSMO has under [the OBO Contract]."  *Id.*

The Subcontract also establishes the terms for payment.  Section 3.3, "Time of Payment," provides that "COSMO shall make monthly progress payments to EMTA following COSMO's receipt of payment from [OBO] within seven (7) working days."  ECF 1-2 at 4.  Further, it states, *id.*:

> It is specifically understood and agreed that payment to EMTA will be directly related to EMTA's scope of work. COSMO's payment to EMTA for its scope of work will also be contingent upon COSMO's receipt of payment from the [OBO] for the same. EMTA specifically acknowledges and agrees and assumes the risk of nonpayment by the [OBO] to COSMO, including retainage, for EMTA's scope of work; provided, however, that the [OBO]'s nonpayment is based upon EMTA's failure to perform its work in a timely and workmanlike manner.  Should the [OBO] withhold payment from COSMO because of EMTA's failure to perform its work in a timely and workmanlike manner, EMTA acknowledges that it will not make any claims against COSMO for payment. For purposes of clarity, the parties agree that EMTA does not assume the risk of nonpayment by the [OBO] if said nonpayment is due to delays or improper performance by COSMO or others.

Under Section 3.4, Cosmopolitan retains the right to withhold payment from EMTA as follows, *id.*: "Upon justifiable and reasonable evidence from the [OBO] of default in any degree by EMTA, COSMO may withhold amounts otherwise due under this Subcontract or due under any other contractual arrangement between the parties to compensate COSMO for costs COSMO has incurred or may incur for which EMTA may be responsible hereunder or otherwise."

Section 5.2 of the Subcontract, titled "COSMO Caused Delays," is also relevant. It provides, *id.* at 5:

> If construction is delayed because of COSMO's act or omission, EMTA shall be entitled to the reasonable costs associated with this delay, including but not limited to, extended supervision, extended general conditions costs, extended overhead, labor inefficiencies, material escalation costs, acceleration costs, and attorney fees. Notwithstanding the foregoing, EMTA shall not be entitled to delay damages incurred due to the delay in completing the design and/or purchase & delivery of HATS for [the Project].

When the Subcontract was executed, Cosmopolitan allegedly had not completed the final construction drawings for the Project. ECF 1, ¶ 7. Plaintiff contends that "Cosmopolitan assured EMTA that construction would be consistent with other similar projects which it allowed EMTA to tour, and consistent with the preliminary drawings and specifications upon which EMTA based its bid." *Id.* EMTA maintains that it "relied upon these assurances and documentation." *Id.*

Plaintiff asserts that Cosmopolitan "failed to properly staff and supervise the Project;" "failed to design the work in accordance with the contract documents;" and its drawings and plans "were internally inconsistent." *Id.* ¶¶ 9, 10. Further, EMTA alleges that OBO often rejected Cosmopolitan's designs for failure to conform to its design criteria. *Id.* ¶ 10. And, EMTA claims that it "timely raised these issues with Cosmopolitan" and notified Cosmopolitan of the "delays and damages that were occurring as a result." *Id.* ¶¶ 9, 10.

4

EMTA contends that Cosmopolitan's failures and mistakes created added costs to the Project and caused delays and inefficiencies. ECF 1, ¶¶ 9, 10. According to plaintiff, pursuant to Section 5.2, EMTA "is entitled to recover its costs associated with delay caused by Cosmopolitan including its extended supervision, extended general conditions, escalation, and attorney's fees." *Id.* ¶ 11.

EMTA asserts that Cosmopolitan first "failed and refused to pay" EMTA in a timely manner for the payment that was due in May 2018. *Id.* ¶ 12. Then, "after EMTA's June 2018 payment application, Cosmopolitan failed to pay EMTA at all." *Id.* According to plaintiff, Cosmopolitan claimed that it was not paying EMTA because it was not getting paid by OBO. *Id.* However, Cosmopolitan apparently assured plaintiff "that payment would be forthcoming, and requested that EMTA continue to perform" under the Subcontract. *Id.* Plaintiff claims that, in reliance on Cosmopolitan's promise, it completed its work under the Subcontract. *Id.* ¶ 13. And, EMTA asserts that both Cosmopolitan and OBO "accepted the work performed by EMTA." *Id.*

Plaintiff contends that Cosmopolitan "regularly submitted its own payment application" to the OBO under the Prime Contract, "which included payment for the work completed by EMTA." *Id.* ¶ 14. And, in doing so, Cosmopolitan "certified to OBO that all work covered by the payment applications was completed satisfactorily, that Cosmopolitan had paid its subcontractors from previous payment applications to the OBO and would timely pay its subcontractors with the proceeds received from the current payment application, and that Cosmopolitan was not invoicing the OBO for amounts it intended to withhold from its subcontractors." *Id.* ¶ 14. However, plaintiff claims that this certification was false because Cosmopolitan had not paid EMTA and "did not pay EMTA for the work that Cosmopolitan was invoicing to OBO." *Id.*

After the completion of the Project, Cosmopolitan claimed that it had been charged for liquidated damages by OBO for failing to timely complete the Project and "was passing those liquidated damages through to EMTA." *Id.* ¶ 16. Cosmopolitan also alleged that "EMTA was responsible for additional delay damages under the Subcontract." *Id.* And, therefore, Cosmopolitan told plaintiff that it owed Cosmopolitan approximately $1.4 million but Cosmopolitan did not owe EMTA anything. *Id.*

However, plaintiff alleges that Cosmopolitan only made these claims "in an effort to avoid its payment obligations to EMTA." *Id.* ¶ 17. And, EMTA claims that Cosmopolitan owes EMTA "in excess of $600,000 in unpaid invoices and retainage from prior progress payments, plus over $800,000 in additional damages due to the numerous delays for which Cosmopolitan was ultimately responsible." *Id.*

In addition, Cosmopolitan asked EMTA to assign an EMTA quality control engineer to assist Cosmopolitan in fulfilling its quality control responsibilities under the Prime Contract. *Id.* ¶ 15. In return, Cosmopolitan agreed to pay EMTA the monthly salary of that engineer. *Id.* The parties signed a consulting agreement to this effect and Cosmopolitan paid the engineer's salary for "much of the Project." *Id.* But, EMTA alleges that Cosmopolitan has "failed and refused to pay for the final months of the engineering support services provided." *Id.*

Finally, plaintiff alleges that Cosmopolitan owes EMTA money for the value added tax ("VAT") payments that EMTA made on Cosmopolitan's behalf. *Id.* ¶¶ 18-21. Under Turkish law, payments for services are subject to an 18% VAT, unless there is an exemption. *Id.* ¶ 18. Because the U.S. government is the owner of this Project, services provided in conjunction with the Project are exempt. *Id.* Nevertheless, Cosmopolitan had to pay the VAT and then file for reimbursement

and provide the Turkish government with proof that the services for which the payments were made were associated with VAT exempt activity.  *Id.*

Because EMTA agreed to act as Cosmopolitan's agent in Turkey with respect to processing its VAT payments, EMTA advanced the VAT payments to the Turkish government on Cosmopolitan's behalf and processed Cosmopolitan's requests for reimbursements.  *Id.* ¶ 19.  Then, when Cosmopolitan received the reimbursements from Turkey, it was supposed to tender the money back to EMTA.  *Id.*  The payments from Cosmopolitan had to be in U.S. Dollars.  *Id.*

Cosmopolitan was supposed to provide EMTA with the documentation necessary for EMTA to process the payments and make requests for reimbursements.  *Id.*  For some of the initial payments, EMTA claims that Cosmopolitan only provided the necessary paperwork for the reimbursement "after unexplained delays."  *Id.* ¶ 19.  And, as a result of the delays, EMTA contends that "by the time the Turkish government reimbursed the VAT payments in Turkish currency, the VAT reimbursement amount was less, in United States dollars, than EMTA had advanced on Cosmopolitan's behalf."  *Id.* ¶ 20.  And, "Cosmopolitan has refused to pay EMTA the shortfall."  *Id.*

Moreover, for subsequent payments, plaintiff claims that Cosmopolitan "refused to provide" EMTA with the documentation that it needed to submit to the Turkish government to secure the reimbursement.  *Id.* ¶ 21.  Therefore, EMTA contends that it has payed "in excess of $75,000 in VAT for which it cannot obtain reimbursement."  *Id.*  And, Cosmopolitan has not reimbursed EMTA for those payments.  *Id.*

On April 28, 2020, ETMA, through counsel, wrote a letter to Cosmopolitan demanding payment for these losses and overdue payments.  *Id.* ¶ 22; ECF 1-3 (the "Demand Letter").

Plaintiff claims that, "[d]espite this demand, Cosmopolitan has failed and refused to pay EMTA monies that are due." ECF 1, ¶ 22.

## II. Standard of Review

### A. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include

"detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by

separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016); *Edwards*, 178 F.3d at 243.  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Two exhibits are attached to the Complaint: the Subcontract (ECF 1-2) and the Demand Letter (ECF 1-3). Both documents are specifically referenced in the Complaint. *See* ECF 1, ¶¶ 6, 11, 19, 22. Accordingly, at this juncture, I may consider the Subcontract and the Demand Letter, without converting the Motion to one for summary judgment.

### III. Discussion

Under Count III, EMTA, incorporating its breach of contract claim (Count I), contends that Cosmopolitan violated the PPA by failing to pay an interest penalty on the amounts that EMTA is owed on the project. ECF 1, ¶¶ 32-34; ECF 18-1 at 4-6.

Cosmopolitan has moved to dismiss Count III, arguing that there is no private right of action for a subcontractor like EMTA under the PPA. ECF 15 at 6-7. Further, the payment-related dispute between EMTA and Cosmopolitan makes the PPA inapplicable. ECF 15 at 6-7. In response, EMTA argues that the Prime Contract is governed by the PPA. ECF 18-1 at 2. And, because the Subcontract incorporates the terms of the Prime Contract, the Subcontract is also governed by the PPA. *Id.* Therefore, it argues that "EMTA's right to collect interest penalty is a matter of contract – not statute." *Id.* at 5.

The PPA was enacted in 1982 "in an effort to provide the federal government with an incentive to pay government contractors on time by requiring agencies to pay penalties – in the form of interest – on certain overdue bills." *U.S. ex rel. IES Commer., Inc. v. Continental Ins. Co.*, 814 F. Supp. 2d 1, 2 (D.D.C.); *see Sarang Corp. v. United States*, 76 Fed. Cl. 560, 569 (Fed. Cl. 2007). The PPA was amended in 1988 to "include explicit provisions applicable to subcontractors." *Continental Ins. Co.*, 814 F. Supp. 2d at 2. Under the amendment, the PPA mandates that prime contractors insert "a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance under its subcontract within 7 days out of such amounts as are paid to the prime contractor by the agency under such contract." 31 U.S.C. § 3905(b)(1). The PPA also requires prime contractors to insert "an interest penalty clause which obligates the prime contractor to pay to the subcontractor an interest penalty on amounts due in the case of each payment not made in accordance with the payment clause…." *Id.* at § 3905(b)(2).

Therefore, the PPA requires a federal contractor to include certain terms and obligations regarding the Prime Contract and payment in every subcontract.

However, courts have repeatedly rejected the argument that the PPA contains either an explicit or implied private cause of action in favor of subcontractors. *Continental Ins. Co.*, 814 F. Supp. 2d at 2-4 ("Absent from the PPA is any explicit provisions for subcontractor enforcement if the prime contractor fails to make timely payment."); s*ee, e.g.*, *United States v. Hartford Accident & Indemnity Co.*, 168 F. Supp. 3d 824, 836 n.19 (D. Md. 2016); *United States ex rel. Asphalt Contractors & Site Work, Inc., v. KAR Contracting, LLC*, 2015 WL 3651279 (S.D. W.V. June 11, 2015); *United States ex rel. Drill Tech Drilling & Shoring, Inc. v. Lexon Ins. Co.*, No. SACV 14-01573 DDP, 2015 WL 3498614, at *3 (C.D. Cal. June 3, 2015); *W & W Steel, LLC v. BSC Steel, Inc.*, 944 F. Supp. 2d 1066, 1080 (D. Kan. 2013); *United States ex rel. CKF Excavating, LLC v. ACC Constr., Inc.*, No. 11-CV-42, 2012 WL 3161294, at *6 (W.D. Ky. Aug. 3, 2012); *United States ex rel. King Mountain Gravel, LLC v. RB Constructors, LLC*, 556 F. Supp. 2d 1250, 1252 (D. Colo. 2008); *United States ex rel. Virginia Beach Mechanical Services, Inc. v. SAMCO Const. Co.*, 39 F. Supp. 2d 661, 677 (E.D. Va. 1999). Both the statutory text and the legislative history indicate that Congress did not intend a subcontractor to have a private right of action under the PPA. *Continental Ins. Co.*, 814 F. Supp. 2d at 2-4; *RB Constructors*, 556 F. Supp. 2d at 1253.

Plaintiff cites no authority to the contrary. Moreover, because all government contracts subject to the PPA require prime contractors to incorporate prompt payment terms in their subcontracts, plaintiff's attempt to distinguish the weight of authority is unavailing.

For these reasons, I shall grant the Motion with respect to plaintiff's PPA claim under Count III.

## IV. Conclusion

For the foregoing reasons, the Motion (ECF 15) is GRANTED. An Order follows, consistent with this Memorandum.


Date: October 15, 2020            /s/
                         Ellen L. Hollander
                         United States District Judge